We are now going to move to the final case of the morning. This is appeal number 19-2420, McCann v. Badger Mining Corporation. We're going to begin with counsel for the appellant, Mr. Reinhardt, who is reserved three minutes for rebuttal. Mr. Reinhardt. Good morning. My name is Pete Reinhardt, and I represent the plaintiff appellant, Ray McCann, in this case. This case involves two issues under the Americans with Disabilities Act. First, did Ms. McCann have a disability within the meaning of the ADA? Second, did Badger Mining select Ms. McCann to be eliminated from the R&D department at Badger Mining because of her disability? As to the issue of disability, the district court in its decision did not make a determination on this issue. McCann contends that she meets the definition of disability because she was regarded as being disabled and had an actual disability. The facts that support this are as follows. In September of 2015, Ms. McCann was diagnosed as suffering from degenerative arthritis in both hands. Degenerative arthritis is a permanent and degenerative condition. Her symptoms started in December of 2014, and the condition and her symptoms continued through the date of her summary judgment responses in 2019. Badger Mining was well aware of Ms. McCann's medical conditions and how the medical conditions affected her, and Ms. McCann's degenerative arthritis substantially limited Ms. McCann's ability to perform manual tasks, to write, and to drive. Badger Mining has argued that Ms. McCann was not disabled because her condition was transitory and minor, which is true that that is a defense to be regarded as prong of disability. However, as the court made clear in Silk v. Board of Trustees, the employer has the burden of proof on this issue, and Badger Mining has simply not provided any evidence to meet its burden of proof. The evidence in the record indicates that McCann's degenerative arthritis was not transitory and minor. To the contrary, it is permanent and progressive, as indicated by the labeling of it degenerative, and it clearly lasted for more than six months. Badger Mining's second argument about disability is that it's subjectively believed that Ms. McCann's condition was transitory and minor. However, the law is clear that it's an objective standard and not a subjective standard. Turning to the issue of causation at summary judgment, Ms. McCann proceeded under the Ortiz method of proof and provided facts in the record and arguments indicating that pretext and suspicious timing established causation. With respect to pretext, this case does not involve an honest mistake or a good faith belief by the employer. It involves deliberate falsehoods and reasons unworthy of credence, in other words, pretext. Badger Mining's first reason for selecting Ms. McCann to be laid off was that she refused to perform batch mixing without extremely detailed instructions and constant guidance from leaders. The facts in the record are disputed and indicate that Ms. McCann never refused to perform batch mixing tasks at all. In fact, she performed batch mixing tasks alone on the night shift where she did not ask any questions because there was no one to ask, and she successfully did that and her batches were used. There's no evidence in the record of any issues or problems with the batches she mixed. That reason was changed during the course of this litigation from refusing to mix batches without detailed instructions to difficulty learning batch mixing responsibilities, which we have argued is a shifting and inconsistent reason, but regardless, that's also not true. As previously stated, she didn't have difficulties. She performed the tasks alone on night shift without asking any questions, and she successfully performed them. The second reason given by Badger Mining to select Ms. McCann for layoff was that she was not able to self-direct and troubleshoot on the fly, and with respect to that reason, this is a case where actions speak louder than words. In May of 2015, Ms. McCann went to the night shift where she worked alone because of harassment by a coworker, Mr. Kowal. She worked there until the time of layoff in November of 2015. She didn't have any supervision on the night shift, and she didn't have anybody to ask questions on the night shift. In fact, when she went on the night shift, she wasn't included in regular meetings of the R&D department because of her night shift hours. And so with respect to that, Badger Mining's actions in May of 2015 show what it believed about her ability to troubleshoot and self-direct. It would not have placed her in this night shift position where she didn't have any support, couldn't ask any questions, and was working alone if she could not self-direct and troubleshoot on the fly. The third reason that has been provided by Badger Mining for the selection of Ms. McCann was team fit and temperament, and the evidence in the record shows that that was not a reason or criteria that was used by Badger Mining at all. Mr. Kowal was in the same R&D department, and he was retained. And the evidence in the record, which I don't believe is disputed, is that he had significant issues with team fit and temperament. He had a history of anger issues resulting in discipline and counseling. That included issues in 2014 and 15, and in fact, those issues were so significant that he was told he could no longer attend quarterly meetings of the company because of conflicts with management. And finally, his harassment was what resulted in Ms. McCann – resulted in her moving from the regular day shift to the night shift. So if team fit and criteria were actually a reason for Ms. McCann's being laid off, Mr. Kowal would not have been retained and would have been laid off. And for that reason – yes. Good morning. It's Judge Scott. I've got a question for you on that. Sure. This Kowal fellow seems to have had some differential knowledge and experience that your adversary points to as the reason why he was kept around, notwithstanding his struggles with his temperament and dealing with others. And that is this experience with the so-called conductivity testing that your client lacked. Would you mind addressing that? Sure. And that is an accurate statement by my opposing counsel. He did have this experience. But my point is slightly different. Badger Mining is arguing that this was an important factor and a reason McCann was chosen. And my point is if that was actually a factor that was used in determining layoffs, then Mr. – even though he had experience, he would have been chosen. And that shows that that's not a standalone factor. It's not a factor that would justify Ms. McCann's termination in and of itself. And that gets me to the issue of – or tease in what meaning it has with respect to pretext. And I know my time is getting short, but I'd like to briefly address that. The district court found that Ms. McCann was required to establish pretext as to each and every reason that was stated by Badger Mining for its layoff decision. While we disagree that she did not establish pretext as to each and every reason, we believe there is a legal issue that would be helpful for the court to address after or tease about pretext. And that is, is the employee still required to establish pretext as to each and every reason? It would seem to me that requiring that would defeat the purpose of or tease to avoid putting evidence into different piles. And in addition, it would provide an incentive for an employer to pile on multiple reasons for a discharge, making it impossible for an employee to successfully contest each reason. But regardless of or tease, there is case law in the Seventh Circuit pre or tease on this issue. The dispositive case is the Russell case. And in that case, the Seventh Circuit said that you do not need to necessarily establish pretext as to each and every reason if the stated reason is not a standalone reason to justify termination. Again, that is in the Russell case, although I think I gave you the wrong page site on that. But it is in the case. And in fact, the court went so far as to say if the reasons are so intertwined or the pretextual nature of one reason is so fishy and suspicious, then those other reasons do not have to be proven to be incorrect. And here, in this case, the standalone reason, the only standalone reason that Badger Mining has cited to really is the batch mixing, which, as I already indicated, was not true under any stretch of the evidence here. Thank you, Mr. Reinhart. You are at time. We're going to move over to Mr. Duffy and Mr. Reinhart. We may give you a brief rebuttal then. Now, on behalf of the Appellee, Attorney Duffy. May it please the court, I'm Robert Duffy, along with my co-counsel, Lindsay Davis, who's on the phone. We're honored to represent Badger Mining in this case. We believe that the issue before the court is whether or not Ms. McCann ultimately provided sufficient evidence to prove her 88 claim, specifically that but for her alleged hand or wrist issues, she would not have been one of the 33 people that Badger Mining chose in October of 2015 for a reduction in force due to its difficult business conditions. We believe that the answer to that question is absolutely no, that Judge Peterson correctly decided that based upon the undisputed evidence. There are two issues before the court, as Attorney Reinhart pointed out. The first is whether or not Ms. McCann had a disability, and the second is whether there's any evidence to prove that but for her hand condition, she would have been discharged. Again, the answer on both of those is no. The court, unfortunately, the District Court Judge Peterson chose not to address the issue of disability. We think that it's valuable and important that the court consider that. And we think that because this is a really unusual case, one in which the plaintiff is alleging that she suffered from an impairment as required under the ADA when, in fact, she had no work restrictions. She could perform her job. She had no inability to work. She herself, at the time of the decision of the reduction in force, stated that her hands were feeling great. So this is a case simply where the doctors all agree that she first saw any doctor for any of her hand or wrist conditions in September of 2015. She saw three doctors between then and October when the reduction in force was made. Each of those three doctors concluded that she had no restrictions, that she was able to work, that she had no limitations as it relates to gripping or repetitive activities or fine manipulation, and that she could perform all of those activities. Further, this is a situation where the court ultimately decided not to go ahead and decide that issue. But this is a case in which Attorney Reinhart has asserted that the limitations that Ms. McCann suffered were ones which really relate to recreational activities and did not actually amount to substantial limitations in any way. And we cited the cases which support the fact that recreational activities such as crocheting or painting or knitting is not by itself a limitation in a major life activity. And although Ms. McCann had some limitations in her ability to drive in the sense that she had to take breaks after driving or that she could cut her lawn but had to take breaks while doing that, she, again, was not precluded from doing those in no court. And the Seventh Circuit certainly has not found that such limitations relate to an impairment of a major life activity. And we would point at this point in particular to the court's decision in Silk v. Board of Trustees. That's a case where the plaintiff alleged that she was discharged – the plaintiff alleged that the plaintiff had been refused work as a result of a perceived disability. And specifically, what the plaintiff alleged was that he had – he was a teacher at the school district. He had a triple bypass surgery that he was required to undergo in the fall of the year in which the decision was made. And as a result of that, he missed some work. He missed some work that – excuse me, he missed some work in the spring. And then in the summer of that year, the college decided not to go ahead and provide him with any courses. And the court looked at the question about, well, has he proved a perceived disability as it relates to the fact that this is someone who had heart surgery and was gone from work? And the court specifically said that in that case, the employee had not been able to establish that, in fact, the school district regarded him as disabled, but rather what it regarded him as was absent. And therefore, there was no perceived disability as it relates to the district's decision in the summer of that year not to give him any courses. The court then distinguished that perceived disability finding as it relates to the only part of the case which survived summary judgment, and that related to the courses that were assigned to that plaintiff in the fall of that year. In the fall of that year, rather than getting his usual four courses, the district only assigned him two. And what the court said, it was in that case there is a potential perceived disability because in that case the employer specifically said, it was alleged to have said, that they didn't assign the plaintiff the case because we didn't think he was physically capable of handling them. And in fact, as of that point, the plaintiff had received a release to return to full work. So if you look at what the court did in silk, it clearly distinguished between when one can establish a perceived disability and not. And in the summer courses, because the person was absent, the court specifically said, even though the employer knew about the fact that he had a heart surgery and that he was off of work, it didn't perceive him as being disabled. The same thing holds true here. When we look at this case, it's a situation where Ms. McCann, again, had no restrictions whatsoever. All of her doctors thought she was fine. She herself, in October of 2015, informed the court, excuse me, informed the employer that everything was fine, that she was feeling great. And in fact, the only thing that BMC understood about her hand or wrist condition is that she may need some time off of work. That's all. And as a result of that, she simply cannot meet the standard to establish either that she had an actual or perceived disability or that badger mining perceived that she did. Again, we would focus the court's attention on the silk case. The big problem in the disability context of this case is if in fact Ms. McCann is able to establish a disability based on these facts, it puts employers in a situation where all they would need to know is simply that an employee had seen a doctor. If an employee had seen a doctor and was diagnosed with a condition under the argument that Ms. McCann is making, she would be disabled. That can't be what the law is. It's not what the case has suggested is. It's not what the court in silk suggested it was. And if the court is to find that a case like this can establish a perceived disability, then I'm afraid that almost all cases will be a perceived disability case if in fact an employee has ever seen a doctor. Separate and apart from the question of whether or not there was any disability, we also have the issue of whether or not she can prove that but for her hand condition, she would have been discharged. Judge Scudder, as you've pointed out, the badger mining in this case looked at four different factors. One of the factors was what was the critical functions that were needed within the department, this R&D department. Mr. Corwall was one of the people that could perform these essential functions, these critical functions. He was the conductivity expert. And as a result, when Ms. Grant and Ms. Breed were making the decision about the R&D department as to who would stay, they determined that he had to stay because he was the expert and Ms. McCann does not dispute that he was. So ultimately what we're left with then is the question of, all right, in the context of a reduction in force, has badger mining articulated through undisputed facts legitimate non-discriminatory reasons for its decision? It has articulated four specific reasons for that, including her difficulty in batch mixing, the fact that she wasn't self-directed or could work on the fly on her own, her temperament in team fit, and as a result of all of those ultimately determined that she was the individual that would leave. Again, look at this in the context of what had happened. It was a reduction in force. So as a result of that, it wasn't a situation where badger mining was saying that Ms. McCann couldn't perform the job. It was saying we have to find the best people we have to continue to work and to continue to perform this work in the midst of difficult business situations, kind of like what's happening now. And as a result of that, it had to look at what were the overall factors and who are the best people. And although Ms. McCann in her briefing would suggest that badger mining should not have considered, that badger mining did not appropriately document all of these reasons, in fact, they were documented in her 2013 and 2014 evaluations. The company specifically addressed these issues about her failure to work without direction, her difficulty in being a team player, the conflict that she was having with other workers. And specifically as it relates to the batch mixing issues, one of the things that I think is important for the court to understand is that Judge Peterson said that, okay, maybe there's a dispute about whether or not, in fact, Ms. McCann was effective in batch mixing. What there's not a dispute about is that badger mining didn't think she was effective, and that's the ultimate question. In effect, there's no dispute that she didn't think she was effective because the one time that they let her try to do it, shortly thereafter, it immediately began looking for another person to come into the department and perform batch mixing duties. And that confirms the fact that the company did not think she was sufficiently skilled in that particular area. And as a result of that, both Grant and Breed, the two supervisors who were considering these issues within the R&D department, began looking for someone else to do the job. And they ultimately were recommended, Mr. Koblentz was recommended by the production department, and he ultimately then came into the department. There's also no dispute that they had those discussions in the summer of 2015, and that he was transferred ultimately in October of 2015, but they had the discussions and had made the decision before Ms. McCann ever disclosed in September of 2015 that she had any issues with her hand. So, although there may be some dispute about whether Ms. McCann perceived her as being expert in batch mixing, there's no dispute that badger mining did not consider her to be an expert, and that Ariane began looking immediately to find someone after they let her try it once, and they didn't think that she was successful. Thank you, Mr. Duffy, that's time for you then. Thank you. Thank you. Mr. Reinhart, we'll give you one minute on rebuttal. Sure. A couple quick points. One, Mr. Duffy is essentially saying that in order to be disabled, an employee must have work restrictions, and that's just not the law, especially under the ADAA and the substantial limitation language in the ADAA. Badger mining did not believe that Ms. McCann was fine and had no further problems. In fact, the day after she said she thought the cortisone injection was helping her, she told two of the management employees that she thought that her hands were a problem and she thought she would need surgery. With respect to Mr. Koblentz, there is a disputed issue of fact about when it was decided he was going to be brought in, but the important factor is when it was decided that he was going to be brought in, there was no documentation of any discussions about bringing him in until after Ms. McCann disclosed her hand conditions. At that time, he was brought in because of her hand conditions, and when he was brought in, it was clear there was going to be only need for one lab tech, and that ended up being him. So, he was brought in to replace Ms. McCann after her disclosure of her hand conditions, timing being September 21st. She disclosed her hand conditions. October 6th, he was brought in. October 9th, she's on a list of people to be eliminated. Thank you, Mr. Reinhart, and thank you, Mr. Duffy. We appreciate your advocacy. Judge Ripple, any questions for the advocates? No, thank you. Judge Scudder? No, not for me. Thank you. The case will be taken under advisement. That is our final case of the morning.